**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

**CIVIL ACTION NO. 4:08-CV-00116-JHM**

**RUTH R. SALMON, et al.**                                                    **PLAINTIFFS**

**V.**

**OLD NATIONAL BANK d/b/a OLD NATIONAL TRUST**               **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Old National Bank, d/b/a Old National Trust's

Motion for Partial Summary Judgment [DN 247], Motion for Summary Judgment to Dismiss Fourth

Amended Complaint [DN 257], Motion for Summary Judgment as to Involuntary Plaintiffs [DN

258], Motion to Preclude Plaintiffs' Expert Witnesses [DN 259], Motion for Summary Judgment

[DN 260], and Motion to Strike the Affidavit of John L. Hoffer [DN 283]. Also before the Court is

Plaintiffs' Motion for Partial Summary Judgment to Establish Liability for Breach of Fiduciary Duty

to Manage the "Webster County Farm" [DN 255] and Motion for Partial Summary Judgment to

Confirm that the Defendant is Estopped from Asserting the Affirmative Defense of Statute of

Limitations Due to its Acts of Concealment [DN 256].   These matters are ripe for decision.

**I. BACKGROUND**

This matter is an action by the beneficiaries of Dr. James L. Salmon's Trust A and Trust B

("the Trusts") against the former Trustee, Defendant Old National Bank, d/b/a Old National Trust.

The Trusts were executed in 1973 and amended in 1978  by Dr. James L. Salmon to provide for his

wife Ruth Salmon, their children, and their lineal descendants.  Dr. James L. Salmon passed away

in  1986,  and  Farmers  Bank  and  Trust  Company,  as  Trustee,  began  making  discretionary

distributions for the care, maintenance, and support of the Trusts' beneficiaries.  Through a series

of mergers and acquisitions, Farmers Bank and Trust Company became part of Defendant Old National Bank.

In 2008, Plaintiffs filed the instant suit, alleging that Defendant violated several fiduciary duties. Plaintiffs sought to have Defendant removed as Trustee. Plaintiffs also sought a declaratory judgment that Defendant breached its fiduciary duties, a surcharge, and an accounting. In the Court's Memorandum, Opinion and Order dated August 2, 2010, the Court granted Plaintiffs' partial motion for summary judgment and ordered that Defendant be removed as Trustee. The parties have now filed several motions regarding Plaintiffs' breach of fiduciary duty claims, including motions for summary judgment and motions to exclude expert witnesses.

## II. DISCUSSION

### A. MOTION TO PRECLUDE PLAINTIFFS' EXPERT WITNESSES [DN 259] AND MOTION TO STRIKE [DN 283]

Defendant has moved to exclude three of Plaintiffs' experts under Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993) and Federal Rule of Evidence 702.

#### 1. STANDARD OF REVIEW

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, the trial judge acts as a gatekeeper to ensure that expert testimony is both reliable and relevant. Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 407 (6th Cir. 2006) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)). In determining whether testimony is

2

reliable, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. In Daubert, the Supreme Court identified a non-exhaustive list of factors that may assist the Court in assessing the reliability of a proposed expert's opinion, including: (1) whether a theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." Id. at 592–94. This gatekeeping role is not limited to expert testimony based on scientific knowledge, but instead extends to "all 'scientific,' 'technical,' or 'other specialized' matters" within the scope of Rule 702. Kumho Tire, 526 U.S. at 147.

Whether the Court applies the Daubert factors to assess the reliability of an expert's testimony "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire, 526 U.S. at 150 (quotation omitted). Any weakness in the underlying factual basis bears on the weight, as opposed to admissibility, of the evidence. In re Scrap Metal Antitrust Litigation, 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted).

## 2. APPLICATION OF STANDARD TO PRESENT CASE

### JOHN L. HOFFER

Defendant contends that John L. Hoffer's expert testimony regarding Defendant's alleged breach of the prudent investor rule must be excluded because it is not a product of reliable principles or methods. Specifically, Defendant argues that the report must be excluded because Hoffer fails to apply any industry custom, treatise, or other authority used in the field of trust administration in formulating his opinion. In response, Plaintiffs state that opinions derived from practical experience, such as those of Hoffer, are not easily subjected to traditional evaluations of reliability. In support,

Plaintiffs cite <u>First Tennessee Bank National Ass'n v. Barreto</u>, where the court admitted an expert's testimony that was "derived largely from [his] own practical experiences throughout forty years in the banking industry."  268 F.3d 319, 335 (6th Cir. 2001).  In so doing, it noted that "[o]pinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation."  <u>Id.</u>  Plaintiffs also cite <u>Century Indemnity Co. v. Aero-Motive Co.</u>, in which the court admitted testimony of an expert whose opinions were "based upon his experience in reconstructing lost insurance policies."  254 F. Supp. 2d 670, 679 (W.D. Mich. 2003).  <u>First Tennessee</u> and <u>Century Indemnity</u> both hold that where an expert forms his opinions from practical experience, exclusion due to their failure to satisfy the <u>Daubert</u> factors is not appropriate.

In this case, the Court agrees with Plaintiffs that the <u>Daubert</u> factors are not a useful tool for evaluating the reliability of Hoffer's opinions.  Moreover, the Court finds that Hoffer's testimony is similar to the expert testimony admitted in <u>First Tennessee</u> and <u>Century Indemnity</u> and should, therefore, be admitted.  Hoffer has extensive experience in trust administration with over fifty years of work in seven banks and as the founder and CEO of North Indiana Trust Company before its acquisition.  (Pls.' Consol. Resp. in Opposition to Mot. For Summ. J.–Count IV & Mot. to Exclude Pls.' Expert Witnesses [DN 276] 20.)  Through these myriad experiences, it is undeniable that Hoffer has become sufficiently familiar with the prudent investor standard and whether an investment plan satisfies that standard.[1]  Indeed, Hoffer's report sufficiently indicates that he bases his testimony on the "same level of intellectual rigor that characterizes the practice in the relevant field."  <u>Bush v. Dyno Nobel, Inc.</u>, 40 F. App'x 947, 960 (6th Cir. 2002) (quoting <u>Kumho Tire</u>, 526 U.S. at 152).  His analysis indicates reliance on industry customs, as he notes that "[i]n the trust

_____

[1] Tellingly, Hoffer has testified as an expert in similar matters in approximately 119 cases.

industry, process is unusually important because trustees are managing someone else's property"
and that there remain "national standards" of appropriate trust management, as evidenced by the
banks that "tout and advertise" certain conduct, behavior, and accountability when marketing their
trust services.  (Pls.' Consol. Resp. [DN 276] 15.)  Also, Hoffer's identification of nine pieces of
information that, in his experience, a trustee needs to know to implement an investment decision
indicates that Hoffer is relying on prevalent standards in the industry, as he has witnessed during his
experiences.  His report is based on more than unsubstantiated beliefs; therefore, Hoffer should not
be precluded from giving his opinion that given the needs of the primary beneficiary Ruth Salmon,
including those based on her age, the focus of the trust should have been on income production, not
asset growth.

To the extent that Defendant contends that Hoffer's opinion is unreliable due to his failure
to properly account for the interests of beneficiaries other than Ruth Salmon–and that it is unreliable
due to his failure to consider all of the nine factors listed in his report–the Court finds that such
complaints go to the weight, not the admissibility, of his testimony.  To be sure, Defendant is free
to address these issues through the use of its own expert testimony, as well as through vigorous
cross-examination.  However, they do not require cursory exclusion of Hoffer's testimony.

To the extent that Defendant contends that Hoffer's report contains inadmissible legal and
factual conclusions, the Court agrees with Defendant that expert testimony "should be excluded .
. . where it amounts to a legal conclusion or merely tells the jury what result to reach."  Century
Indem., 254 F. Supp. 2d at 677.  The Court finds, however, that this rule is not a proper basis for
excluding the testimony here.  Hoffer's opinions do not tell the jury what result to reach; instead,
they are intended to help the jury determine whether Defendant breached its fiduciary duty.  This

5

is acceptable. "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. Therefore, Defendant's motion to exclude Hoffer's testimony is **DENIED**.

Defendant has also moved to exclude the affidavit of John L. Hoffer on the ground that it is untimely and deficient. In support, Defendant argues that the affidavit is improper supplementation that "is, in fact, a second bite at the apple–an opportunity to correct fatal defects in the reports they have submitted." (Def. Old Nat'l Trust Co.'s Mot. to Strike Aff. of John L. Hoffer [DN 283] 3–4 (quoting Cohlmia v. Ardent Health Services, LLC, 254 F.R.D. 426, 433 (N.D. Okla. 2008)).) In response, Plaintiffs contend that the affidavit is merely information that would have been obtained during an expert deposition, had one been taken. However, since the Court finds Hoffer's opinions and qualifications to be sufficiently reliable without reliance on the affidavit, it is irrelevant whether it should be classified as improper supplementation or admissible deposition-like information. Defendant's motion to exclude the affidavit of John L. Hoffer is thus **DENIED** as moot.

#### STEVEN A. WHEELER

Defendant has also moved to exclude the testimony of Plaintiffs' expert Steven A. Wheeler. Wheeler's report contains two opinions: the first is that Defendant violated the prudent investor standard due to an improper asset allocation in the Trusts from 1999 until 2002; the second concerns the estimated damages caused under the yardstick method of damage calculation.

In regards to the opinion that Defendant violated the prudent investor standard, Defendant contends that the opinion is inadmissible because Wheeler is not qualified to offer such testimony. Plaintiffs counter by arguing that Wheeler is more than qualified to offer an opinion on the prudent investor standard and that the appropriate remedy for Defendant is cross-examination regarding his qualifications–not exclusion of his testimony. The Court agrees with Plaintiffs that while Wheeler

has not worked in the field of trust administration *per se*, he has sufficient experience with investing and financial planning so as to be familiar with the prudent investor standard and whether an investment plan satisfies that standard. His experience is only compounded by his qualifications as a Certified Public Accountant, Certified Financial Planner, and Certified Financial Specialist; these qualifications do not detract therefrom. The Court reiterates that Defendant is free to address its concerns through the use of its own expert testimony, as well as through vigorous cross-examination.

In regards to the opinion on estimated damages, Defendant contends that Wheeler cannot testify as to the damages calculation because such testimony is unreliable. Specifically, Defendant contends that Wheeler's report is incomplete, failing to provide Defendant with sufficient notice on the calculation's methodology and reasonableness. The Court finds, however, that Wheeler's report sufficiently identifies the method used to calculate damages–namely, the yardstick method. It also adequately addresses the inputs used to create the yardstick portfolio–namely, Morningstar software using benchmark indices for the damage period, with an 80% bond index and 20% S&P 500 index. This information provides Defendant with sufficient notice to prepare a rebuttal to the damages calculation such that there is no fear of ambush at trial. Again, to the extent that Defendant contends the report contains inadmissible factual and legal conclusions, the Court notes that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. Thus, the expert report itself should not be summarily excluded.

Further, in regards to the opinion on estimated damages, Defendant contends the calculation should be struck because it only considers a small portion of the period during which Wheeler opines that the assets were improperly allocated. Defendant highlights that while Wheeler believes

the assets were improperly allocated from 1995 until 2002, his damage calculation only includes the years 1999 until 2002. Defendant believes that Wheeler's inclusion of only the years that the market as a whole performed poorly makes the report unreliable. Other courts that have considered this issue, however, have found that it is the defendant who bears the burden of demonstrating that losses from a breach of duty were offset by gains that resulted from the same breach. See, e.g., Alco Indus., Inc. v. Wachovia Corp., 527 F. Supp. 2d 399, 409 (E.D. Penn. 2007). The Court believes this approach is more acceptable. Thus, while Defendant remains free to rebut Plaintiffs' damages calculation, that burden does not fall on Plaintiffs. The fact that Wheeler's report does not include an offset sum does not render it unreliable; it is still based on sufficient methodology. Defendant's motion to exclude the testimony of Wheeler is **DENIED**.

### MATTHEW E. VOLKMAN

Defendant has moved to preclude Matthew E. Volkman from submitting expert testimony at trial. Plaintiffs previously withdrew Volkman's expert designation. As such, Defendant's motion to exclude Matthew Volkman as an expert witness is **DENIED** as moot.

### B. DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT REGARDING BREACH OF PRUDENT INVESTOR DUTY CLAIM [DNS 247, 260]

Defendant has filed two motions for summary judgment on Plaintiffs' breach of prudent investor duty claim, arguing several alternative theories. These theories are addressed in turn.

### 1. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue

8

of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party

satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a

genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving

party, the non-moving party must do more than merely show that there is some "metaphysical doubt

as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986).  Instead, the Federal Rules of Civil Procedure require the non-moving party to present

specific facts showing that a genuine factual issue exists by "citing to particular parts of materials

in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine

dispute[.]" Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the

[non-moving party's] position will be insufficient; there must be evidence on which the jury could

reasonably find for the [non-moving party]."  Anderson, 477 U.S. at 252.

## 2. APPLICATION OF STANDARD TO PRESENT CASE

### DEFENDANT'S ARGUMENTS IN MOTION FOR PARTIAL SUMMARY JUDGMENT [DN 247]

In its Motion for Partial Summary Judgment [DN 247], Defendant first argues that Plaintiffs'

claims regarding Defendant's alleged breach of the prudent investor standard are barred by the Trust

Agreement's language.  In other words, Defendant argues that the Agreement contains exculpatory

language that waives any liability on the Trustee's part regarding its failure to follow the prudent

investor rule.[2]  In response, Plaintiffs contend that the relied-upon language is not exculpatory and

---

[2] Specifically, Defendant points to the language in Article IV that the Trustee has power:
> (E) To invest and reinvest in such stocks, bonds, and other securities and properties as it may
> deem advisable including stocks and unsecured obligations, undivided interests, interests in
> investment trusts, mutual funds, legal and discretionary common trust funds, leases, and
> property outside the Trustee's domicile, all without diversification as to kind or amount

is instead a mere broad grant of discretion to the Trustee.  The Court finds Plaintiffs' argument to be more persuasive.  Thus, Defendant is not entitled to judgment as a matter of law.

Under Kentucky law, exculpatory clauses are not invalid *per se*. See Cumberland Valley Contractors, Inc. v. Bell County Coal Corp., 238 S.W.3d 644, 650 (Ky. 2007).  Also, a trust's settlor and trustee can contract away the "prudent man" standard.  See K.R.S. § 386.710 ("**Except as otherwise provided by the terms of the trust**, the trustee shall observe the standards in dealing with the trust assets that would be observed by a prudent man . . . ." (Emphasis added)).  However, contracts containing exculpatory clauses are disfavored and are "strictly construed against the parties relying upon them."  Cumberland Valley Contractors, Inc., 238 S.W.3d at 649.  For such clauses to be valid, their wording "must be so 'clear and understandable that an ordinarily prudent and knowledgeable party to it will know what he or she is contracting away; it must be unmistakable.'" Id. (quoting Hargis v. Baize, 168 S.W.3d 36 (Ky. 2005)).

In this case, strictly construing the relied-upon language against Defendant, the Court finds that the language is not exculpatory, as its wording is not so "clear and understandable" that an ordinarily prudent and knowledgeable party would know that he or she was exonerating the Trustee if the Trustee was to breach the trust's terms or act in a negligent or an ill-advised manner.  In fact, it is far more likely that an ordinarily prudent and knowledgeable person would conclude that the language is **not** an exculpatory clause–especially in light of the fact that the Trust Agreement does,

---

**without being restricted in any way by any statute or court decision (now or hereafter existing) regulating or limiting investments by fiduciaries.**
Def. Old Nat'l Trust Co.'s 2d Mot. for Partial Summ. J. [DN 247], Ex. A (emphasis added).

in fact, include an "unmistakable" exculpatory clause in Article V 2.(b).[3]  As Plaintiffs accurately state: "While the passage grants broad authority to invest, nothing begins to state that the Trustee is free to do so without liability . . . ."  (Pls.' and Involuntary Pls.' Joint Resp. in Opp'n to Def., ONB's, Jan. 12, 2012 Mot. for Partial Summ. J. [DN 251] 11.)  Partial summary judgment is inappropriate.

Defendant next argues in its Motion for Partial Summary Judgment [DN 247] that Plaintiffs' claims fail because they only consider a limited part of the investments–not the portfolio as a whole. The Court finds, however, that such an argument is not a valid basis for dismissing Plaintiffs' claims.  For the court to grant Defendant's motion, Defendant must meet its initial burden of identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  It does not do so here.  Instead, Defendant chooses to merely criticize Plaintiffs' expert and his damages calculation, claiming that Plaintiffs were "quite misleading" about the value of distributions and the potential return on assets. This is an insufficient basis for granting summary judgment. The proper remedy is for Defendant to present its concerns at trial by the use of cross-examination and its own expert testimony.  The fact that Plaintiffs chose not to emphasize the entire performance of the trust portfolio and investment strategies does not entitle Defendant to judgment as a matter of law.  Defendant's motion is **DENIED**.[4]

---

[3] It states that "[w]hen acting at the direction, or with the consent of the Grantor, **the Trustee shall be relieved from any liability arising out of such action** except as may arise from its own gross negligence and intentional misconduct."  Def. Old Nat'l Trust Co.'s 2d Mot. for Partial Summ. J. [DN 247], Ex. A, 15 (emphasis added).

[4] Defendant's remaining argument presented in this motion for partial summary judgment relating to the statute of limitations defense is addressed elsewhere in this Memorandum, Opinion and Order.

**DEFENDANT'S ARGUMENTS IN MOTION FOR SUMMARY JUDGMENT [DN 260]**

Defendant also makes various arguments in its Motion for Summary Judgment [DN 260] that must be analyzed.  These arguments are addressed in turn.

**A. Plaintiffs' theory of the case and arguments for damages are not in violation of the trustee's duty of impartiality.**

Defendant submits that Plaintiffs' theory of the case and arguments for damages must fail as a matter of law because they violate the trustee's duty of impartiality.  The Court disagrees. Under Kentucky statutes, "a bank empowered to act as a fiduciary or trust company, when . . . managing property held in a fiduciary capacity, shall act as a prudent investor would" by exercising "reasonable care, skill and caution."  K.R.S. § 286.3–277.  Additionally, as a trustee, a bank must "[c]onform to fundamental fiduciary duties of loyalty and impartiality . . . ."  See Anderson v. Old Nat'l Bancorp, 2010 WL 3091330, at *5 (W.D. Ky. Aug. 6, 2010) (quoting K.R.S. § 286.3–277). Importantly, however, impartiality does not mean equality.  Comment (b) to § 79 of the Restatement (Third) of Trusts make this clear, stating: "It would be overly simplistic, and therefore misleading, to equate impartiality with some concept of 'equality' of treatment or concern–that is, to assume that the interests of all beneficiaries have the same priority and are entitled to the same weight in the trustee's balancing of those interests."  Thus, the fact that Plaintiffs reference Ruth Salmon as the primary beneficiary and suggest that the asset allocation should have been adjusted in a different manner due to her age does not mean their claims are insufficient as a matter of law.

The Court notes that in respect to this issue, there remain genuine issues of material fact concerning the prudence of the asset allocation between stocks and bonds in light of Ruth Salmon's needs and the remaindermen's interests, as well as concerning Defendant's reasonableness in setting its investment objectives and monitoring the Trusts' assets and investments.  Also, the Court notes

12

that resolution of this issue, as well as this case, will largely depend on determinations about expert financial testimony.  As such, the Court declines to grant summary judgment as to prudence.  See Boeckman v. A.G. Edwards, Inc., 2007 WL 4225740 (S.D. Ill. Aug. 31, 2007) (declining to grant the parties' summary judgment motions on their prudence claims for similar reasons).

**B. Plaintiffs' claims for damages are not barred.**

Defendant next argues that Plaintiffs' theories regarding the equity-bond ratio of investments impermissibly ignore the real property assets held by the Trusts.  In other words, Defendant suggests that trustees have a duty to view trust assets as a whole when formulating investment strategy and that summary judgment is proper here because Plaintiffs failed to consider the farms in their damages calculation.  The Court, however, finds that these concerns go to the weight of the evidence, not its admissibility.  They are not a proper basis for the Court's entry of judgment as a matter of law.

In Baker Boyer National Bank v. Garver, cited by Defendant in support of its argument, the court found the trustee liable for not "mak[ing] any considered conscious balancing of risks and advantages in weighing the amount invested in farm land equity against the amount invested in fixed income securities."  719 P.2d 583, 589 (Wash. App. 1986).  In other words, the court based the trustee's liability on its failure to balance real estate assets with equity investments.  Defendant, however, fails to explain how this holding entitles a trustee to summary judgment when a plaintiff's damages calculation fails to reduce the equity percentage in the equity-bond ratio of investments, and the Court finds this extrapolation from the holding to be unsound.  Indeed, the court in Baker Boyer National Bank v. Garver simply elaborates upon the trustee's fiduciary duty; it does not let a trustee escape liability simply because a plaintiff's damages calculation highlights other

13

investments.  Id.

Also, as a related matter, the Court highlights that "[b]ecause opinion testimony always is subject to evaluation by the fact finder, it generally has been held not an appropriate basis for summary judgment." Bowman v. Henard, 547 S.W.2d 527, 530 (Tenn. 1977).  Steven A. Wheeler's opinion testimony as to the proper amount of damages, then, should be scrutinized by Defendant at trial.  The Court declines to grant summary judgment at this time.

**C. Plaintiffs' treatment of the Trust Agreement is not a proper basis for summary judgment.**

Defendant next contends that Plaintiffs misconstrue the Trust Agreement by asserting that all trust assets should be geared toward income production.  According to Defendants, such position is "clearly inappropriate" for any trust with remainder interests.  (Def.'s Mot. for Summ. J. [DN 260] 12.)  Essentially, this argument follows Defendant's "impartiality" argument discussed above, which was premised on Plaintiffs' failure to consider the remaindermen's interests.  As with that argument, the Court finds this one to be flawed.  Construing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that Defendant should have given income production greater weight and that Defendant was imprudent in pursuing a more aggressive investment approach.  There remain genuine issues of material fact concerning the prudence of the asset allocation between stocks and bonds in light of Ruth Salmon's needs and the remaindermen's interests, as well as concerning Defendant's reasonableness in setting its investment objectives and monitoring the Trusts' assets and investments.  Therefore, summary judgment is inappropriate.  The Court notes that Defendant is free to present its concerns about the "divergent interests of the remainder beneficiaries which would dictate a more aggressive investment approach" at trial.

14

**D. While tax consequences are an important factor in managing trusts, Plaintiffs' failure to address them in their damages calculation is not a proper basis for summary judgment.**

Defendant further argues that Plaintiffs' claims must fail as a matter of law because they do not address tax consequences in constructing a benchmark portfolio.  Comment (b)(1) to § 77  of the Restatement (Third) of Trusts indicates that tax consequences are an important factor that a trustee should consider in managing trusts.[5]  However, Defendant cites no authority suggesting that a failure to consider tax consequences in a damages calculation is a proper basis for entering judgment against Plaintiffs as a matter of law.  Again, it seems that Defendant's argument is nothing more than a mere attack on Plaintiffs' damages calculation.  This is insufficient for summary judgment.  See Severstal N. Am., Inc. v. N. Am. Refractories, Co., 2009 WL 1620115, at *8 (E.D. Mich. June 9, 2009) (noting that the "case boils down to a battle of the experts" and that this "makes [the] action not a good candidate for summary judgment"); see also In re Nw. Airlines Corp., 208 F.R.D. 174, 207 (E.D. Mich. 2002) (noting that "[t]he battle of the parties' experts . . . must await resolution at trial").

**E. Defendant's claim that Plaintiffs fail to address the performance of the trust assets as a whole is not a proper basis for summary judgment.**

Defendant claims that judgment should be entered as a matter of law because Plaintiffs fail to address the performance of the trust assets as a whole.  Essentially, Defendant argues that had the Trustee invested 20% stocks to 80% bonds starting in 1991, the Trusts "would not have experienced the same significant gains in value" and that Plaintiffs, therefore, cannot demonstrate that they have

---

[5] The pertinent section states: "Other considerations . . . that are likely to be important to prudent administration of a trust include: the expected returns (including both income and capital elements) or other benefits of various courses of action that might be pursued, plus their anticipated tax and cost consequences . . . ."

been damaged.  (Def.'s Mot. for Summ. J. [DN 260] 15.)  Since this basic argument has previously been addressed in this Memorandum, Opinion & Order in the Court's discussion on Steven A. Wheeler's damages calculation, the Court declines to restate its analysis here.  Instead, the Court reiterates that it is the defendant who bears the burden of demonstrating that losses from a breach of duty were offset by gains that resulted from the same breach.

**F. Plaintiffs have submitted admissible evidence to support their claims for violation of the prudent investor standard.**

Defendant next contends that with the exclusion of Plaintiffs' expert opinions, all claims based on the prudent investor standard must be dismissed because common law negligence claims "must be supported by expert testimony where they involve issues . . . beyond the common experience and understanding of the average jury."  Adkins v. CSX Transportation, Inc., 2011 WL 2935399, at *4 (Ky. App. July 22, 2011) (citation omitted).  Since the Court has deemed Plaintiffs' expert opinions admissible, however, Defendant's argument collapses.  It is moot.

**G. Causation can be established.**

Finally, Defendant contends that Plaintiffs cannot establish a causal link between Defendant's actions and the loss suffered.  In support, Defendant suggests that it cannot be liable since the losses performed closely with the fall of the market itself.  Defendant cites _In re_ Duffy for the proposition that to hold Defendant "liable for the portfolio's losses when the portfolio's valuation fluctuation almost exactly followed the market would be akin to expecting him to have had the prescience to invest and outperform the market, an unreasonable requirement the law does not expect."  2009 WL 2929420, at *6 (N.Y. Sur. Sept. 8, 2009).  The Court finds, however, that the _In re_ Duffy decision does not mandate summary judgment as to causation in this case.

In _In re_ Duffy, the court entered its decision as to causation **after** a three-day bench trial.

16

Id. at *1.  The court did not enter summary judgment as to the issue and did not indicate that doing so would have been proper.  In fact, the court's opinion merely suggests that it was "logical to conclude that the losses experienced by the estate's portfolio were due to drops in the market itself." Id. at *6.  It in no way indicates that such conclusion was the only logical one to make.  In this case, construing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that Defendant's performance was the cause-in-fact of Plaintiff's harm.  There are genuine disputes of material fact as to whether the asset allocation chosen by Defendant was prudent and whether the losses, if any, were attributable to Defendant's allocation or the market.  Defendant has failed to meet its burden to establish the absence of a genuine dispute of material fact.  Accordingly, its motion is **DENIED.**

### C. Plaintiffs' Motion for Partial Summary Judgment Regarding Statute of Limitations Defense [DN 256]

Plaintiffs' Third Amended Complaint alleges that Defendant breached its fiduciary duty by failing to disclose its annual internal audits for the years 2000 until 2002.  (See Third Am. Compl. [DN 166] ¶¶ 78–81.)  According to Plaintiffs, these audits revealed that trust assets were "improperly allocated for the objectives of the Clients" and "had ONB disclosed the audit statements or its corporate knowledge of the contents of the internal audits to the beneficiaries, the Plaintiffs would have taken immediate action" instead of allowing the Trusts' corpus to remain in the aggressively-weighted stock portfolio.  (Id. at ¶¶ 79–80.)  Plaintiffs discovered the internal audits when they were provided by Defendant in 2009, as discovery in the instant case.  (Id. at ¶ 79.)

In the Court's August 2, 2010 Memorandum, Opinion and Order, the Court found that Plaintiffs' claims accrued no later than June 30, 2002 and were subject to a five-year limitations period under K.R.S. § 413.120.  (See Memorandum, Opinion and Order dated August 2, 2010 [DN

17

165] 8.) Plaintiffs' case was filed originally in the Hopkins County Circuit Court on August 7, 2008.

Absent tolling of the limitations period, Plaintiffs' claims as to breach of fiduciary duty are barred.

Plaintiffs have moved for partial summary judgment on Defendant's statute of limitations defense,

claiming that Defendant should be estopped from asserting it under K.R.S. § 413.190(2) because

Defendant's failure to disclose the audits–or their contents–is an act of concealment tolling the

statute.  Defendant responds by arguing that Plaintiffs have failed to demonstrate active concealment

and have failed to exercise due diligence to discover their cause of action.

> K.R.S. § 413.190(2) codifies the doctrine of fraudulent concealment.  It states that:
>
> When a cause of action mentioned in KRS 413.090 to 413.160 accrues against a resident of this state, and he by absconding or concealing himself or by any other indirect means obstructs the prosecution of the action, the time of the continuance of the absence from the state or obstruction shall not be computed as any part of the period within which the action shall be commenced.

For a plaintiff to establish equitable tolling under a fraudulent concealment theory, he must prove

"'(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover

the operative facts that are the basis of his cause of action within the limitations period; and (3)

plaintiff's due diligence until discovery of the facts.'" Hoover v. Langston Equip. Assocs., Inc., 958

F.2d 742, 745 n.1 (6th Cir. 1992) (quoting Dayco Corp. v. Goodyear Tire and Rubber Co., 523 F.2d

389, 394 (6th Cir. 1975)).  Regarding the exercise of due diligence, a plaintiff "has an affirmative

duty to use diligence in discovering his cause of action within the limitations period" and "'[a]ny

fact that should excite his suspicion is the same as actual knowledge of his entire claim.'" Hazel v.

General Motors Corp., 863 F. Supp. 435, 440 (W.D. Ky. 1994) (quoting Dayco Corp., 523 F.2d at

394).  "In other words, 'the means of knowledge are the same thing in effect as knowledge itself.'"

Id. (quoting Wood v. Carpenter, 101 U.S. 135, 143 (1879)).

Defendant argues that there is no duty to disclose the internal audits themselves because they are an incomplete picture of the trust portfolio.  Plaintiffs contend that regardless of whether the audits should have been disclosed, their content, which revealed an improper asset allocation, should have.  Assuming without deciding that Defendant had a duty to disclose the audits–or, at least, their content–the Court finds that the facts taken in the light most favorable to Defendant demonstrate a lack of due diligence on Plaintiffs' part.  Partial summary judgment is inappropriate.

The evidence of record demonstrates that from 1985 until 1994, the trust portfolios had an approximate asset allocation ratio of 20% stocks to 80% bonds.  From 1995 until at least 2002, the ratio changed to an approximate 50%-50% split between stocks and bonds, with the stock proportion often overtaking the bond proportion.  Plaintiffs received monthly account statements reflecting the types and amounts of the stocks and bonds held in each  respective trust portfolio.  In April of 2000, former-Plaintiff Ruth Salmon and Plaintiff Sue Anne Salmon met Matthew Volkman of Pettinga Financial Advisors to discuss Defendant's performance as Trustee.  In a letter, dated April 24, 2000, Volkman summarized his meeting between those two individuals, himself, and Defendant.  (See Def.'s Resp. to Mot. Partial Summ. J. [DN 271], Ex. E.)  In that letter, Volkman recounted that he:

> discussed the investment strategies that Old National Trust is implementing within [the trust] portfolio. **It does not appear that they have any asset allocation target**. They more so select individual stocks and attempt to diversify by industry weightings. **I am not at all impressed with the overall management of the liquid investments of the trust due to their lack of attention to asset allocation**.

(Id. (emphasis added).)

As discussed above, to successfully invoke fraudulent concealment, Plaintiffs must show due diligence.  See Hazel, 863 F. Supp. at 440 ("An injured party has an affirmative duty to use diligence in discovering his cause of action within the limitations period" and "[a]ny fact that should excite

19

his suspicion is the same as actual knowledge of his entire claim." (Internal quotation marks omitted)).  In other words, "plaintiffs have an obligation to exercise reasonable care and diligence to discover whether they have a viable legal claim."  Moody v. Cooper Indus., Inc., 2006 WL 1207703, at *3 (E.D. Ky. May 3, 2006) (citing Hazel, 863 F. Supp. at 439).  In the present case, Plaintiffs have presented no evidence regarding their due diligence to discover whether their claim was viable.  Conversely, Defendant has produced facts to permit a jury to find that Plaintiffs were sufficiently aware of the asset allocation through their account statements and their consultation with Matthew Volkman–yet failed to act in the face of this knowledge.  Under these circumstances, there is a genuine dispute of material fact regarding Plaintiffs' due diligence.

The Court finds Plaintiffs' citation to Alagia, Day, Tarautwein & Smith v. Broadbent, 882 S.W.2d 121 (Ky. 1994) and Security Trust Co. v. Wilson, 210 S.W.2d 336 (Ky. 1948) unpersuasive. While Alagia includes a discussion of the duty of full disclosure in a professional relationship, the issue in the case was not whether estoppel was appropriate under the fraudulent concealment doctrine; instead, the case addressed the continuing representation rule under the discovery doctrine. See Alagia, 882 S.W.2d at 124–25.  By contrast, in Security Trust, the issue addressed was whether a fiduciary who concealed a fact that was in his sole possession had engaged in a sufficient act of concealment.  Security Trust, 210 S.W.2d at 338–39.  Thus, neither case addresses the necessity of a plaintiff to demonstrate due diligence under the fraudulent concealment doctrine.  Since the Court does not believe that either decision was intended to establish a separate set of elements regarding fraudulent concealment conducted by a fiduciary, the Court finds that Plaintiffs' citation to these cases does not relieve or alter their burden to demonstrate due diligence.  Because the evidence in the light most favorable to Defendant demonstrates a lack of due diligence on Plaintiffs' part,

Plaintiffs' motion for partial summary judgment on the statute of limitations is **DENIED.**

### D. MOTIONS FOR SUMMARY JUDGMENT REGARDING WEBSTER COUNTY FARM [DN 255, 257]

Plaintiffs' Fourth Amended Complaint [DN 201] asserts a claim for breach of fiduciary duty in the management of the Webster County Farm.  Plaintiffs allege that Defendant "failed to manage the Webster County farm during HCC's reclamation efforts in a reasonably prudent manner consistent with its fiduciary obligations" as Trustee and as agent for the individual owners.  (Fourth Am. Compl. [DN 201] ¶ 100.)  According to Plaintiffs, Defendant breached its prudent management duty by failing to maintain and monitor the mining permit compliance and reclamation, resulting in the property remaining under permit for several years longer than necessary, and by failing to attempt to secure a share in the profits of the crops grown on the farm during the reclamation process.  (Id.)

The undisputed facts are as follows.  As of September 4, 1986, Trust A and Trust B held a 50% interest, and Plaintiffs each owned a 10% individual interest, in the 175-acre Webster County Farm.  On September 4, 1986, Defendant, acting as Trustee, and Plaintiffs, acting individually, entered into a lease agreement with Providence Coal Reserves Partnership.  In this lease agreement, Defendant and Plaintiffs granted, leased, and demised to Providence:

> the exclusive right to remove the overburden and surface [of the Webster County Farm] to explore for and mine any and all of the No. 13 or No. 14 . . . seam of coal lying in and under the described property for a period of five (5) years from the date of this lease and continuing thereafter until all of the mineable and merchantable coal has been mined to exhaustion[.]

(Def.'s Mot. for Summ. J. to Dismiss Fourth Am. Compl. [DN 257], Ex. A, 1986 Coal Lease ¶ 1.) The consideration for the lease agreement included an advance royalty payment of $10,000, as well as continuing royalty payments and wheelage fees.  (See id. at ¶¶ 2–3.)  These payments were to be

21

mailed directly to Plaintiffs individually, and to Defendant as Trustee, in accordance with their respective ownership interests.  (Id. at ¶ 6.)  Also, Providence agreed to comply with all of the laws of the Commonwealth of Kentucky and the United States regarding the acceptable method of mining, as well as regarding the reclamation of the Webster County Farm following the completion of mining activities.  (Id. at ¶ 8.)  By 2000, Hopkins County Coal ("HCC") had been assigned all Providence's rights to the coal lease agreement as Providence's successor-in-interest.

Following execution of the lease agreement, Farmers Bank and Trust Company, Defendant's predecessor Trustee, issued a letter to Plaintiffs, requesting that Plaintiffs execute "an Agency type agreement setting out [the Trustee's] authority to act for [Plaintiffs] as individual owners regarding the Webster County Farm."  (Def.'s Mot. for Summ. J. to Dismiss Fourth Am. Compl. [DN 257], Ex. B, Agency Agreement.)  This Agency Agreement was executed on December 3, 1987, just more than one year after the coal lease agreement was executed.  It states in pertinent part that:

> [Farmers Bank and Trust Co.] is hereby designated as Agent for itself as Trustee as aforesaid, and for the [Plaintiffs as individual owners], to collect all rents, crop production sales, or other income of this nature, due and to become due, applicable to said property, and to deposit in the Farmers Bank and Trust Company in an account or accounts of appropriate designation that portion of said income belonging to the [Plaintiffs] and to draw checks against said account for the purposes of paying that portion of the insurance premiums, repairs, upkeep, farm production costs, or other expenses necessary or proper for the upkeep and management of said property. . . .
>
> [Farmers Bank and Trust Co.] will receive as compensation for its services three per cent (3%) of the gross income from crop production sales each year.

(Id.)  Neither Defendant, nor its predecessor, received compensation under the Agency Agreement.

In approximately 2000, the last royalty payment from the coal lease agreement was received.  At some point thereafter, reclamation of the Webster County Farm began.  According to Kentucky Administrative Regulations, reclamation occurs in phases: Phase I involves backfilling, regrading,

topsoil replacement, and drainage control, including soil preparation, initial seeding, and mulching; Phase II involves establishing revegetation, including three successive years of crop production that meet designated yield standards if the land is to be returned to cropland; and Phase III involves successfully completing all surface coal mining and reclamation operations in accordance with the approved reclamation plan.  See 405 K.A.R. 10:040, § 2(4); 405 K.A.R. 16:200, § 5.

In 2003, a local farmer named Randy Nally was hired to aid in the reclamation of the Webster County Farm, as part of a larger reclamation project for HCC.  Although all 175 acres of the Webster County Farm had been permitted for surface mining, only 75 acres were actually strip-mined. (Nally Dep. 38:4–6.)  The other 100 acres were not stripped.  Instead, they were left "undisturbed," except for the presence of two silt basins located thereon.  (Lee Dep. 12:19–13:10.) As such, the 100 acres that were not mined were never farmed as part of the reclamation process. They were allowed to "grow-up" with cedars and saplings, making the property unfarmable.  (Id. at 13:2–7.)  In 2003, Nally planted grass seed and laid down straw on the 75 acres of previously-mined property.  (Nally Dep. 12:20–24, 13:15–17.)  In 2004, when the grass had fully grown, HCC had Nally cut it. However, in lieu of paying him, HCC permitted Nally to bale the grass as hay and keep the bales.  (Id. at 15:11-14.)  For the next three years, Nally continued to do so.

Thereafter, in 2008, Defendant contacted HCC regarding the reclamation of the Webster County Farm.  (See Harris Dep. 17:11–24.)  At this point, HCC began planting crops in an effort to have the performance bond lifted so that the Webster County Farm could be returned to the owners as farmland.  (Id. at 24:3–9.)  HCC agreed to allow Nally to farm the property at his own expense; in return, Nally was permitted to keep the proceeds from the crops planted.  (Nally Dep. 30:3–8.) On the 75 acres that were farmed, Nally first planted soybeans in 2009.  These were harvested and

met the necessary yield requirements under the Kentucky Administrative Regulations.  (Nally Dep. 29:22–24, Lee Dep. 29:17–22.)  The following year, Nally planted corn that also met the necessary yield requirements when harvested.  (Nally Dep. 43:19–21, Lee Dep. 29:23–25.)  There was thus one more crop cycle that had to be planted in 2011 before the bond could be released.  Apparently, that crop was planted; the Cabinet conducted a bond release inspection on January 19, 2012.  (Pls.' Mot. for Partial Summ. J. on Fourth Am. Compl. [DN 255], Ex. H, Bond Release Notice.)

Plaintiffs' allegations against Defendant regarding the management of the Webster County Farm are two-fold: (1) that Defendant failed to stay apprised of the reclamation work following the termination of royalty payments, which resulted in the property not returning a crop-producing asset as soon as it could have; and (2) there was an unwarranted loss of the share of profits from the crop production that occurred during bond release.  The parties have filed cross motions for summary judgment regarding these claims, as they relate to the Webster County Farm.

"Under Kentucky law, a breach of fiduciary duty claim requires a plaintiff to prove: '(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe such duty; and (3) an injury proximately resulting therefrom.'"  Miller v. Reminger Co., L.P.A., 2012 WL 2050239, at *12 (W.D. Ky. June 6, 2012) (citation omitted).  Whether a duty exists is a question of law for the court to decide.  Pathways, Inc. v. Hammons, 113 S.W.3d 85, 89 (Ky. 2003).  "Breach and injury, are questions of fact for the jury to decide."  Id.  In this case, the parties do not dispute that as the Trustee, Defendant owed Plaintiffs a fiduciary duty to manage the Webster County Farm.

"When acting as a fiduciary . . . banks and trust companies shall . . . be subject to the same duties and responsibilities, have the same rights and powers, and receive the same compensation as is allowed the individual holding or exercising similar offices or trusts."  K.R.S. § 286.3-220(1).

24

Under Kentucky law, those duties require the trustee to "observe the standards dealing with the trust assets that would be observed by a prudent man as defined in KRS 386.800(3)." K.R.S. § 386.710. The prudent man "means a trustee whose exercise of trust powers is reasonable and equitable in view of the interests of income or principal beneficiaries or both, and in view of the manner in which men of ordinary prudence, diligence, discretion, and judgment would act in the management of their own affairs." K.R.S. § 386.800(3). This was the duty Defendant owed Plaintiffs regarding the farm.

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DN 257]

In its Motion for Summary Judgment [DN 257], Defendant's first argument is that Plaintiffs' claim is for negligently supervising HCC, which requires proof that HCC was negligent. Plaintiffs respond by contending that Defendant has mischaracterized their claim. According to Plaintiffs, the Fourth Amended Complaint is clear that their allegations are based on a breach of fiduciary duty–not on negligent supervision. As a general rule, "the plaintiff, not the defendants, remains the master of a complaint, including the master of what law she opts to invoke in filing a claim." Ohio *ex rel.* Skaggs v. Brunner, 629 F.3d 527, 531 (6th Cir. 2010). In this case, Plaintiffs have clearly chosen to file a breach of fiduciary duty claim–not a negligent supervision claim. Therefore, Plaintiffs' failure to allege or demonstrate an underlying negligent act by HCC is of no concern.[6]

Defendant's second argument is that Plaintiffs had equal interests and duties as joint owners of the Webster County Farm and that they are, therefore, precluded from bringing a claim related to its mismanagement. Defendant, however, offers no authority for the proposition that a trustee is

---

[6] Notably, Defendant's reliance on Airdrie Stud Inc. v. Reed, 2003 WL 22796469 (Ky. App. Nov. 26, 2003), and Estate of Burton v. Trover Clinic Foundation Inc., 2011 WL 8318231 (Ky. App. Jun. 10, 2011) is misplaced. These decisions are based on claims of negligent retention and negligent credentialing in the employment setting. They have absolutely no bearing on Plaintiffs' Fourth Amended Complaint, which states a claim based on breach of fiduciary duty.

relieved of liability for failing to manage trust property in a prudent manner where the plaintiff-beneficiary failed to manage his own individual interest in the property. "It is well-established that courts '[are] not obligated to consider unsupported arguments inadequately developed in the briefs.'" Singleton v. Astrue, 2010 WL 6004448, at *3 (E.D. Ky. June 28, 2010) (quoting Lewless v. Sec'y of Health & Hum. Servs., 25 F.3d 1049 (Table) (6th Cir. 1994); see also McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (Citation omitted)). Thus, since Defendant has failed to support its argument with any legal authority, the Court deems its argument waived. Summary judgment is inappropriate.

Defendant's third argument is that Defendant could not have breached its duty regarding the failure to secure a share of the profits related to the crops' growth during reclamation since Plaintiffs are not entitled to crop revenue under the coal lease agreement. Defendant specifically contends that under the lease, HCC was granted the right to conduct mining operations on the property, including reclamation, and because reclamation includes three seasons of productive crop growth, HCC was entitled to grow crops on the property–and retain the crops from the property–for three years. By contrast, Plaintiffs contend that since the lease was silent regarding the ownership of crops grown on the property, the issue was left to the private parties as a matter of contract; moreover, Plaintiffs contend that because there was no express right for the coal lessee to retain the crops, Defendant was obligated at least to inquire into obtaining a share in crop proceeds.

The Court accepts Plaintiffs' contention that the issue presented is "not a construction of state reclamation laws, but a matter of enforcement of the applicable coal mining lease agreement."

(Pls.' Resp. to Def.'s Mot. for Summ. J. on its Mismanagement of Webster County Farm [DN 275] 12.)  However, while the coal lease agreement makes clear that HCC had the exclusive right to explore for and mine the Webster County Farm, it makes no reference as to whether HCC had the authority to retain any crop yields.  Under Kentucky law, as correctly noted by Plaintiffs, the absence of ambiguity renders the construction of an agreement solely within the providence of the trial court. See Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381 (Ky. App. 2002).  But "[w]here a contract is ambiguous **or silent** on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties."  Id. at 385 (emphasis added); see In re Tolliver, 2012 WL 2952239, at *18 (Bankr. E.D. Ky. July 19, 2012) (noting that "[w]hen a contract is silent with respect to a matter vital to the rights of the parties, a court, in construing it, is necessarily compelled to resort to a consideration of the surrounding circumstances and the conduct of the participants indicating their interpretations") (citation omitted).

In this case, the Court finds that the coal lease agreement is not ambiguous as to HCC's rights in regards to whether HCC had the authority to retain the crop yields.  Nevertheless, it is silent on the matter.  See generally Savedoff v. Access Grp., Inc., 524 F.3d 754 (6th Cir. 2008) ("The fact that a contract . . . is silent on a particular point does not make it ambiguous." (Citation omitted)).  This silence means the Court is entitled to hear parol and extrinsic evidence involving the circumstances of the agreement's execution, the contract's subject matter, the objects to be accomplished, and the parties' conduct.  See Terry Barr Sales Agency, Inc. v. All-Lock Co., 96 F.3d 174, 181 (6th Cir. 1996) (holding that summary judgment was inappropriate where the parties' agreement was silent as to post-termination commissions and the plaintiff alleged entitlement to

commission on all re-orders occurring before or after his termination). Therefore, at trial, the parties may present evidence regarding their intent, as well as evidence of the then-prevailing industry practice[7], in relation to whether the coal lessee was permitted to retain control of crop proceeds realized during reclamation. On the current record, without this evidence, the Court is not willing to determine the issue.

Defendant's final argument is that Plaintiffs have failed to provide sufficient proof of causation. Specifically, Defendant contends that there is insufficient evidence that Plaintiffs suffered an injury as a result of HCC's delayed crop production during reclamation. In support, Defendant highlights the fact that the performance bond's removal requires not only that the land demonstrate three years of crop growth, but also that the crop growth meet certain yield requirements. Defendant then argues that because the crops grown in 2009 and 2010 barely satisfied the yield requirements, it is a logical conclusion that had the crops not been delayed and the soil not been allowed to become nutrient-rich, earlier-planted crops would have failed to meet the yield requirements.

Construing the facts in the light most favorable to Plaintiffs, the Court finds that while the explanation offered by Defendant is one potential inference, it definitely is not the only logical one. After all, while Lee Harris, HCC's civil engineer in charge of crop production during reclamation, testified at his deposition that often times it is good to delay crop growth for several years after grass is initially planted to allow the soil to build up organic materials, (Lee Dep. 36:17–22), he also testified that HCC's delay was **not** done to strengthen the soil and that had HCC been contacted

---

[7] The Court notes that there has already been some testimony by Kiah Winstead and Lee Harris that during reclamation, it is perhaps industry custom to allow a farmer to keep the proceeds from crop production during reclamation.

prior to 2008, it would have started growing the crop phases earlier in an attempt to get the performance bond released.  (Id. 36:8–37:15.)  At best, then, Defendant's argument creates a genuine dispute of material fact regarding the injury suffered by Plaintiffs due to Defendant's failure to have HCC pursue bond release prior to 2008.  Since a rational jury could conclude that the earlier-planed crops would have met the yield requirements, Defendant is not entitled to summary judgment.  Its motion for summary judgment on Plaintiffs' Fourth Amended Complaint is **DENIED**.

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DN 255]**

In its Motion for Partial Summary Judgment [DN 255], Plaintiffs first seek to establish that the Agency Agreement entered into between Plaintiffs and Defendant's predecessor designated that predecessor as Plaintiffs' agent for **all** aspects of the management of the Webster County Farm–thus making Defendant solely responsible for its management.  Defendant contends that the Agency Agreement merely authorized the trustee to act as Plaintiffs' agent for **only** farming operations.  In Kentucky, an agency relationship's existence "is a question of fact to be determined by a jury from a consideration of all the evidence, facts, circumstances, acts, and conduct of the parties." Crump v. Sabath, 88 S.W.2d 665, 667 (Ky. 1935) (cited with approval by Concrete Materials Corp. v. Bank of Danville & Trust Co., 938 S.W.2d 254, 260 (Ky. 1997)).  Thus, the jury should determine whether an agency relationship existed and, if so, its extent. The facts surrounding the Agency Agreement's creation (including that it was created nearly one year after the property was leased exclusively for the production of coal), its language (including the fact that its terms almost exclusively describe farming activities), and the parties' conduct (including that Plaintiffs were involved with asserting their interests in the farm during the period of the coal lease agreement) should all be considered.

Notwithstanding, Plaintiffs contend that in the absence of an agency relationship, Defendant had a duty to manage the Trusts' 50% interest in the Webster County Farm in a prudent manner–and that it breached that duty by failing to take appropriate actions. The evidence submitted by Plaintiffs regarding Defendant's breach of duty is three-fold: (1) that following the conclusion of active mining operations and the receipt of the last royalty check in approximately 2000, Defendant did not inquire into the status of the Webster County Farm for nearly eight years; (2) that when Defendant first inquired into the performance bond's removal from the property in 2008, it failed to have the 100 acres that were not actively mined returned immediately to a crop-producing asset; and (3) that Defendant failed to know that crops were being grown on the property, and subsequently failed to investigate whether it was entitled to a share of the proceeds from those crops. As damages, Plaintiffs contend that they have lost approximately four years of crop growth due to the fact that the bond should have been lifted no later than 2008. Plaintiffs also claim a share of the crop proceeds that were realized during the property's reclamation between 2004 and 2011.

While these facts are undisputed, Plaintiffs have failed to demonstrate that they constitute a breach as a matter of law. Breach is ordinarily a question of fact for the jury to decide. See Pathways, Inc. v. Hammons, 113 S.W.3d 85, 89 (Ky. 2003) ("Breach and injury, are questions of fact for the jury to decide.") While Plaintiffs spend much of their memorandum discussing Defendant's actions or inactions, they devote little to whether these actions constitute a breach of Defendant's duty to manage the property as a prudent man. There still remains a genuine dispute of material fact regarding this element. Summary judgment is thus inappropriate.

For example, in its analysis denying Defendant's motion for summary judgment on this claim, the Court found that Plaintiffs provided sufficient evidence to survive summary judgment

30

regarding causation related to the failure to have the crop-producing phase of reclamation started earlier.  However, that determination by the Court was made in the light most favorable to Plaintiffs.  In the light most favorable to Defendant, the current evidence of record could lead a reasonable jury to find that planting the crop phases earlier would not have produced sufficient yields to release the performance bond on the property.  Thus, there remains a genuine dispute of material fact regarding causation related to the failure to have the crop phases commenced sooner.

Also, as for the failure to immediately seek the release of the 100 unmined, "undisturbed" acres, there is a genuine dispute as to whether such immediate release was even possible or feasible.  Although Lee Harris testified that the 100 acres were not subject to the three-phase crop production requirement, there were silt basins allowed on the property.  (See Harris Dep. 13:2–10.)  Plaintiffs have directed the Court to no evidence regarding when the silt basins could have been removed.  Plaintiffs have also failed to demonstrate that HCC had the capability to remove the performance bond for the 100 acres only.  These issues, then, are best preserved for trial.

Additionally, as for Defendant's failure to inquire into or demand a share of the proceeds of the crops grown during reclamation, there are not only genuine disputes as to whether HCC had the authority to retain the crop yields, as according to the parties' intent and industry customs, but also as to whether Defendant's failure to inquire into or demand violated the prudent man standard.  The Court has found no case law addressing this issue.  Likewise, while Plaintiffs believe that Defendant should have insisted on a share of crop proceeds, it is worth noting that Plaintiffs themselves willfully gave up any claim to the 2012 crop proceeds to have the performance bond lifted.  (See Harris Dep. 30:6–25.)  A reasonable jury could conclude that Defendant likewise waived any share in the crop proceeds in order that the property could be returned to the landowners sooner–and that

31

this action was a prudent move.  <u>See</u> Restatement (Third) of Trusts, § 86 cmt (c)(1) (finding that a trustee should take into account the customary practices and circumstances in the relevant market and that there are circumstances where it may be appropriate to agree to reduced rental payments or a longer lease period depending on the eventual benefit to the Trust).  Under these circumstances, then, the Court finds there are genuine disputes of material fact.  Accordingly, Plaintiffs' motion for summary judgment on the Fourth Amended Complaint is **DENIED**.

### E. MOTION FOR SUMMARY JUDGMENT AGAINST INVOLUNTARY PLAINTIFFS [DN 258]

Defendant has also moved for summary judgment against Involuntary Plaintiffs, arguing that with the Trusts' termination, Involuntary Plaintiffs no longer have standing under Article III.  Under Article III, standing requires proof of three elements: "(1) [plaintiffs have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180–81 (2000). However, it is not enough for Plaintiffs to have standing at the outset of litigation; "the suit must remain alive throughout the course of litigation, to the moment of final appellate disposition." 13B Charles Alan Wright et al., Federal Practice and Procedure § 3533 (3d ed. 2008); <u>Gottfried v. Med. Planning Servs., Inc.</u>, 280 F.3d 684, 691 (6th Cir. 2002).  "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277, 287 (2000) (quoting <u>County of Los Angeles v. Davis</u>, 440 U.S. 625, 631 (1979)); <u>see also</u> <u>Brock v. Int'l Union, UAW</u>, 889 F.2d 685, 690 (6th Cir. 1989) ("Mootness is determined by examining whether an actual controversy between the parties exists in light of

intervening circumstances.").

Defendant admits that Involuntary Plaintiffs had standing prior to the termination of Trust A and Trust B due to their contingent remainder interests. Defendant then contends, however, that the Trusts' termination without the occurrence of the contingencies permanently precluded those interests from ever vesting. Thus, according to Defendant, Involuntary Plaintiffs no longer hold an interest in the outcome of this litigation. By contrast, Plaintiffs and Involuntary Plaintiffs contend that Involuntary Plaintiffs still have standing as contingent remaindermen under Article II(c)(3)(c) of the Trust document. Essentially, Plaintiffs argue that when Trust B was terminated and split into four separate trusts, as required by the trust document, Involuntary Plaintiffs remained "sprinkle" beneficiaries because Plaintiffs retained a power of appointment with respect to the trusts' principal that could only be appointed to the Grantor's then-living issue, Involuntary Plaintiffs. According to Plaintiffs, then, Involuntary Plaintiffs still have standing as "sprinkle" beneficiaries.

The Court agrees with Plaintiffs that Involuntary Plaintiffs maintain standing in the instant suit. Under the trust document, Involuntary Plaintiffs are granted a contingent remainder interest in the principal of the four separate trusts, recently created from Trust B, subject to appointment by Plaintiffs. Also, Involuntary Plaintiffs have allegedly suffered an actual, particularized "injury in fact"–namely, the reduction of principal in the recently formed separate trusts, to which they have contingent remainder interests. Moreover, that injury is fairly traceable to the challenged action of Defendant, and it is likely that the injury would be redressed by a favorable decision. Therefore, Involuntary Plaintiffs still have standing in the current action.

It is worth noting that in its reply, Defendant argues in two sentences that the absence of Planters Bank and Trust Company, the Trustee of the newly formed separate trusts, as a party to the

litigation requires that Involuntary Plaintiffs be dismissed.  This argument appears to be questioning whether Involuntary Plaintiffs are the real parties in interest and not whether they have standing.  See Anderson v. Old Nat'l Bankcorp., 2009 WL 2422324, at *2–3 (W.D. Ky. July 29, 2009).  As this argument was raised for the first time in Defendant's reply, and Plaintiffs have not had a chance to respond to it, this argument is deemed waived and the Court will not consider it.  See Keys v. Dart Container Corp. of Ky., 2012 WL 2681461, at *6–7 (W.D. Ky. July 6, 2012); O & G Energy, LLC v. Rimkus Consulting Grp., LLC, 2011 WL 6153194, at *6 (E.D. Ky. Dec. 12, 2011).  Accordingly, Defendant's motion for summary judgment on this issue is **DENIED**.

### III. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant's Motion to Preclude Plaintiffs' Expert Witnesses [DN 259] is **DENIED** as to the expert testimony of John L. Hoffer and Steven A. Wheeler regarding the breach of the prudent investor rule, and is **DENIED**, as moot, as to Matthew E. Volkman.

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike the Affidavit of John L. Hoffer [DN 283] is **DENIED** as moot.

**FURTHER** that Defendant's Motion for Partial Summary Judgment [DN 247] is **DENIED**.

**FURTHER** that Defendant's Motion for Summary Judgment as to Plaintiffs' claim for breach of the prudent investor rule [DN 260] is **DENIED**.

**FURTHER** that Plaintiffs' Motion for Partial Summary Judgment to Confirm that the Defendant is Estopped from Asserting the Affirmative Defense of Statute of Limitations Due to its Acts of Concealment [DN 256] is **DENIED**.

**FURTHER** that Defendant's Motion for Summary Judgment to Dismiss Fourth Amended

34

Complaint [DN 257] is **DENIED**.

     **FURTHER** that Plaintiffs' Motion for Partial Summary Judgment to Establish Liability for

Breach of Fiduciary Duty to Manage the "Webster County Farm" [DN 255] is **DENIED**.

     **FURTHER** that Defendant's Motion for Summary Judgment as to Involuntary Plaintiffs

[DN 258] is **DENIED**.

cc: counsel of record

                    **Joseph H. McKinley, Jr., Chief Judge**
                      **United States District Court**

                          September 18, 2012